## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

No. 5:14-CV-433-F

| | |
|---|---|
| PRODIGIOUS VENTURES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| YBE HOSPITALITY GROUP, LLC, YBE | ) |
| ENTERPRISE, LLC, YBE OXFORD, LLC, ) | |
| and YBE MILLEDGEVILLE, LLC, | ) |
| | ) |
| Defendants, | ) |
| | ) MEMORANDUM AND |
| v. | ) RECOMMENDATION |
| | ) |
| TRAVIS E. KELLEY, | ) |
| | ) |
| Counterclaim Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| JAMES BUTLER and JOHN TYE HILL, | ) |
| | ) |
| Counterclaim Plaintiffs. | ) |

This matter comes before the court on the motion for partial summary judgment, pursuant

to Rule 56 of the Federal Rules of Civil Procedure, of Defendants YBE Hospitality Group, LLC,

YBE Enterprise, LLC, YBE Oxford, LLC, and YBE Milledgeville, LLC, (collectively "YBE") and

Counterclaim Plaintiffs James Butler ("Butler") and John Tye Hill ("Hill") (YBE, Butler, and Hill,

collectively, the "Movants"). [DE-58]. Plaintiff Prodigious Ventures, Inc., ("Prodigious") and

Counterclaim Defendant Travis E. Kelley ("Kelley") filed a response in opposition [DE-69], and

Movants filed a reply [DE-72] and a Notice of Suggestion of Subsequently Controlling Decided

Authority [DE-85]. Accordingly, the motion is ripe for decision and is considered here as a

recommendation to the district court. *See* 28 U.S.C. § 636(b)(1)(B); *see also* Local Civil Rule 72.3(c). For the reasons set forth below, it is recommended that the motion for partial summary judgment [DE-58] be denied.

## I. STATEMENT OF THE CASE

Prodigious filed an action against YBE in Wake County Superior Court on June 23, 2014, alleging claims for breach of contract and unfair and deceptive trade practices [DE-1-1], and YBE timely removed the action to this court [DE-1]. YBE answered the complaint and asserted counterclaims against Prodigious for breach of contract, against Kelley for breach of fiduciary duty and constructive fraud, and against both Prodigious and Kelley for conversion and unfair and deceptive trade practices. [DE-15]. Butler and Hill were subsequently allowed to intervene. [DE-46]. Movants now seek summary judgment on liability with respect to their breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices counterclaims, and YBE seeks summary judgment on Prodigious's breach of contract claim. [DE-58].

## II. STATEMENT OF FACTS

Travis Kelley provided financial advising services to individuals including professional athletes. Kelley Aff. [DE-69-1] ¶ 2. He has a business degree with a minor in economics from the University of North Carolina at Chapel Hill, experience working with SunTrust Bank and Prudential Financial, several securities and insurance licenses, and has completed the prerequisites to become a Chartered Financial Consultant. Providence Grp. Dep. [DE-59-2] 140:9–25. Kelley offered financial services over time through a variety of entities, including The Providence Group of North Carolina ("Providence Group NC"), which provided financial advising to clients, and Athlon Entertainment, LLC ("Athlon"), which offered services not provided by Providence Group NC such

2

as banking management, expense tracking, real estate purchase assistance, bill payment, personal travel, and relocation. Kelley Aff. [DE-69-1] ¶¶ 5–6. In 2005, Kelley formed Prodigious to offer the additional services of business planning and consulting that were not offered by his other entities, and in 2007, he formed Providence Group Sports and Entertainment, LLC ("Providence Group") to consolidate the financial planning and personal management services previously performed by Providence Group NC and Athlon. *Id.* ¶ 8; Prodigious Dep. [DE-59-3] at 14:11–17. There is no formal corporate relationship between Prodigious and Providence Group, although Providence Group employees sometimes worked on Prodigious matters because Prodigious had no employees of its own besides Kelley. Providence Grp. Dep. [DE-59-2] 52:12–54:4. Kelley worked on both Providence Group and Prodigious matters and explained that he was " the only person that had two hats." *Id.* at 55:11–20. From 2007 through 2011, Kelley was also a Registered Player Financial Advisor with the National Football League Players Association. *Id.* at 143:1–21.

Butler and Hill are former professional football players who hired Kelley as their financial advisor. Butler Decl. [DE-60] ¶ 3; Hill Decl. [DE-61] ¶ 3. Butler played in the National Football League ("NFL") from 2005 through 2011, and Hill played in the NFL from 2006 through 2010. Butler Dep. [DE-59-5] 6:1–10; Hill Dep. [DE-59-4] 8:25–9:4. Both Butler and Hill met Kelley in 2005 while they were still in college at their respective schools, Georgia Tech and Clemson. Butler Dep. [DE-59-5] 6:17–25; Hill Dep. [DE-59-4] 11:6–19. In July 2005, Butler entered into an agreement with Kelly's company Athlon. Providence Grp. Dep. [DE-59-2] 31:7–17, 33:12–18, Ex. 3 [DE-59-10]. In December 2005, Hill entered into an agreement with Kelley's company Providence Group NC. *Id.* at 43:22–44:16, Ex. 5 [DE-59-11]. Kelley acknowledged that when he began advising Butler and Hill they were relatively inexperienced in financial matters and they trusted

3

Kelley to provide them with financial advice. *Id.* at 15:7–11, 25:21–26:1. For a $500 monthly fee, Kelley and his staff provided a variety of services to Butler and Hill, including money management, formulating a written financial plan and providing semiannual reviews thereof, bill payment, budgeting, recommending the purchase of insurance and annuities, and risk management. *Id.* at 23:9–25:11. Kelley continued to provide financial services to Butler and Hill through Providence Group after it was formed in 2007. *Id.* at 31:18–10, 48:22–50:19. Butler and Hill relied on Kelley and Providence Group to handle most all aspects of their finances. Butler Dep. [DE-59-5] 7:18–8:14; Hill Dep. [DE-59-4] 12:15–13:1, 14:12–15.

In 2006, Butler was looking for an investment opportunity that would help support him after his football career ended, and he asked Kelley to look into several opportunities including a Golden Corral franchise. Providence Grp. Dep. [DE-59-2] 89:8–91:1; Butler Dep. [DE-59-5] 9:3–13; Hill Dep. [DE-59-4] 31:6–14. Kelley later brought the Golden Corral opportunity to Hill. Hill Dep. [DE-59-4] 16:9–14. Kelley initially researched Golden Corral through the information available on its website and then arranged a meeting for himself, Hill, and Butler with the Golden Corral corporate leadership at its headquarters in Raleigh, North Carolina in February or March 2007. Prodigious Dep. [DE-59-3] 30:9–16; 54:2–8. Hill and Butler assert that Kelley recommended they pursue the Golden Corral franchise opportunity, they trusted his advice, and they followed his recommendation. Butler Decl. [DE-60] ¶ 4; Hill Decl. [DE-61] ¶ 4. Kelley would not go so far as to concede that he recommended the opportunity, but rather stated that he was comfortable with Golden Corral for a variety of reasons and characterized his role as providing information to allow Butler and Hill to make an informed decision. Prodigious Dep. [DE-59-3] 46:19–50:20.

After the decision was made to pursue the Golden Corral franchise, Kelley claims that Hill

4

and Butler asked him to oversee their Golden Corral operations. Providence Grp. Dep. [DE-59-2] 166:5–10. Kelley advised Butler and Hill that a CPA and attorney would be needed and, after some research, recommended CPA John Heroux and attorney David Hilton. Kelley Aff. [DE-69-1] ¶¶ 11-14. Hilton drafted the operating agreement for YBE Enterprise, LLC, which was created for the purpose of owning and operating the first Golden Corral franchise in Centerville, Georgia, and also drafted the April 2007 Service Agreement between YBE Enterprise, LLC and Prodigious. *Id.* ¶ 15. Kelley characterized Hilton as Hill and Butler's attorney and YBE's attorney, denied being Hilton's primary contact for YBE, and also indicated that he did not recall instructing Hilton to set up YBE Enterprise, LLC because it was not his job to tell Hilton what to do. Providence Grp. Dep. [DE-59-2] 129:22–130:7; Prodigious Dep. [DE-59-3] 67:21–68:1, 92:6–23. However, Kelley later acknowledged a series of emails in which he provided direction to Hilton regarding work to perform on behalf of YBE. Prodigious Dep. [DE-59-3] 93:1–98:17. Kelley was also listed in Hilton's files as the client contact for the YBE entities. [DE-59-31 through 59-33]. Butler and Hill denied providing Hilton with any direction regarding his work for YBE. Butler Decl. [DE-60] ¶ 5; Hill Decl. [DE-61] ¶ 5.

Prodigious provided the following services for YBE: review of Golden Corral franchise opportunities, i.e., due diligence; identification of site selection and regions for development; retaining engineers, architects, and other professionals; working with lenders to assemble a financial package; interviewing and selecting the management team; creating an employee handbook; and procuring an employee benefits provider, insurance coverage, and payroll and bookkeeping services. Prodigious Dep. [DE-59-3] 23:24–25:12. As a general matter, Prodigious was responsible for administration of YBE, while store managers handled the day-to-day operations of the restaurants.

*Id.* at 25:13–21. In exchange for its services Prodigious received an initial fee of $8,500 during a restaurant's developmental period and thereafter 3% of the monthly gross revenues, and the term of the Service Agreement was seven years with no express early termination provision, although it did provide that "[t]his period may vary according to any changes or modifications requested by [YBE.]" [DE-1-1] at 10 §§ 2–3.1. Kelley stated that he informed Hilton that Prodigious would accept a 3% fee for its work on behalf of YBE, but that he had no significant involvement in crafting the other terms of the agreement. Kelley Aff. [DE-69-1] ¶¶ 17-18. Kelley had discussions with Golden Corral corporate and determined that it performed such administrative services for one franchisee for 5% of gross monthly revenues plus some percentage of profits, and so Kelley thought 3% was fair. Prodigious Dep. [DE-59-3] 57:6–58:16; Providence Grp. Dep. [DE-59-2] 167:8–12. Butler and Hill indicated that they were not involved in drafting or negotiating the terms of the April 2007 Service Agreement between YBE Enterprise, LLC and Prodigious, or the later service agreements between other YBE entities and Prodigious, did not have the agreements reviewed by another attorney, and signed those agreements because Kelley told them to and they trusted him. Butler Decl. [DE-60] ¶¶ 7–8; Hill Decl. [DE-61] ¶¶ 7–8. Kelley could not recall whether he advised Hill and Butler to have a lawyer other than Hilton review the Service Agreements, but indicated that he generally advised clients to have someone look over anything they signed and that he considered this particular situation unique because Hill and Butler had an attorney (Hilton) involved in creating the agreement. Prodigious Dep. [DE-59-3] 121:12–122:2.

Kelley indicated that Prodigious only became involved after the Golden Corral meeting when there was a realization that a management infrastructure would be necessary for not only day-to-day operations, but also for administration, such as selecting a management team, accounting, and

6

bookkeeping. *Id.* at 36:23–37:15, 54:9–55:18. Kelley explained that he performed these services through Prodigious, rather than Providence Group, because the Providence Group's financial planning model would not include such services. *Id.* at 31:3–15; Providence Grp. Dep. [DE-59-2] 91:6–96:3. Prodigious and Kelley had no prior experience providing such services in the restaurant industry, but Kelley assured Butler and Hill that he had an entrepreneurial spirit and could learn the business. Prodigious Dep. [DE-59-3] 15:10–13; Hill [DE-59-4] 23:9–24.

In early 2009, YBE opened the first Golden Corral franchise in Centerville, Georgia and it was by all accounts profitable. Kelley Aff. [DE-69-1] ¶ 20; Hill Dep. [DE-59-4] 138:2–5; Butler Dep. [DE-59-5] 34:6–19. Butler and Hill were still playing football in the NFL at that time and had little or no involvement in the business, relying on Kelley and Prodigious to manage their interests. Hill Dep. [DE-59-4] 22:8–26:4, 54:25–56:11; Butler Dep. [DE-59-5] 18:21–19:16, 24:24–25:17. In May 2010, Kelley asked Butler and Hill to sign Service Agreements on behalf of YBE Oxford and YBE Milledgeville with Prodigious to develop and open a second and third Golden Corral franchise in Oxford, Alabama and Milledgeville, Georgia. Prodigious Dep. [DE-59-3] 123:15–18, 125:4–7. The terms of these agreements were identical to the 2010 Service Agreement with YBE Enterprise, and Kelley could not recall whether Hilton was consulted regarding the later service agreements or whether he advised Butler and Hill to have the agreements reviewed by any legal counsel. *Id.* at 123:2–21. Kelley, through Prodigious, also suggested to Butler and Hill ways to finance these new restaurants, including using the annuities they previously purchased at Kelley's recommendation. *Id.* at 193:23–197:5. The Oxford restaurant opened in November or December 2010, and the Milledgeville restaurant opened in April or May 2011. *Id.* at 193:11–16. Prodigious performed similar work for Oxford and Milledgeville to the work it performed for Centerville, except that there

7

was no construction to oversee for Milledgeville, which was an existing restaurant. *Id.* at 65:3–66:8.

In June 2011, shortly after the Milledgeville store opened, YBE Enterprise loaned Providence Group $60,000, which Kelley described as an advance on the fees Prodigious earned under its service agreements to be used for expanding Kelley's staff and office space to accommodate the work he was performing for YBE. Providence Grp. Dep. [DE-59-2] 178:2–192:7. Providence Group made no payments on the loan after YBE terminated the Prodigious service agreements in May 2013, and the loan balance was the subject of a separate state court action. *Id.* 186:1–6, 189:5–8.

In late 2011 and early 2012, Hill and Butler began to question how Kelley and Prodigious were managing their Golden Corral investment. Hill Dep. [DE-59-4] 79:2–11; Butler Dep. [DE-59-5] 45:11–46:10, 54:13–55:23. As a result, they hired attorney David Messer to conduct a review related to the work performed by Prodigious for YBE. Hill Dep. [DE-59-4] 70:1–72:22; Butler Dep. [DE-59-5] 51:15–24, 53:17–54:7. Butler and Hill explained that they did not want to end their relationship with Kelley, but rather wanted to put more boundaries in place and to have more transparency as they moved forward. Hill Dep. [DE-59-4] 72:6–15, 79:2–11; Butler Dep. [DE-59-5] 58:20–59:12, 60:24–61:5. After Messer completed the review, in March 2012 a new service agreement (the "Management Agreement") was executed to encompass the three existing restaurants and two additional planned stores in Valdosta and Tuscaloosa. Providence Grp. Dep. [DE-59-2] 134:19–135:24; Hill Dep. [DE-59-4] 75:23–76:2. Kelley negotiated the terms and signed the new agreement on behalf of Prodigious. Providence Grp. Dep. [DE-59-2] 135:25–136:8; Prodigious Dep. [DE-59-3] 137:7–15. Generally, the material terms of the new agreement were not different from the prior agreements, with the exception of a shorter term with respect to the forthcoming Valdosta

8

and Tuscaloosa restaurants. Providence Grp. Dep. [DE-59-2] 135:25–136:8; Prodigious Dep. [DE-59-3] 137:16–138:12; Butler Dep. [DE-59-5] 59:13–25; Kelley Aff. [DE-69-1] ¶ 35.

Later in 2012, after the new Management Agreement was in place, Butler and Hill became more involved in YBE and learned of problems concerning its management employees, including David Stribling, the regional manager for the YBE restaurants who was hired by Kelley and paid $11,000 monthly, and some employees of Providence Group who performed work for YBE informed Butler and Hill of perceived mismanagement by Kelley. Hill Dep. [DE-59-4] 79:12–83:24, 97:16–105:1; Butler Dep. [DE-59-5] 38:10–39:5; Butler Dep. [DE-59-6] 103:21–104:7, 116:4–18. Hill and Butler called Kelley in April 2013 to inform him that they were not satisfied with his services to YBE and would be terminating their agreement. Hill Dep. [DE-59-6] 113:1–114:12. Kelley indicated he was not told of any wrongdoing or dissatisfaction with his services, but that Hill and Butler said they could no longer afford Prodigious, wanted to have more involvement in YBE, and Butler did not like Kelley and did not want to do business with him any longer. Prodigious Dep. [DE-59-3] 251:1–254:23; Kelley Aff. [DE-69-1] ¶ 36. In May 2013, YBE Hospitality formally terminated the Management Agreement by letter detailing numerous alleged performance deficiencies by Prodigious. [DE-15-1]. Thereafter, Hill and Butler became involved in the day-to-day management of their restaurants to try to salvage their collective investment of more than $1.7 million. Hill Dep. [DE-DE-59-4] 111:12–24, 137:3–4; Butler Dep. [DE-59-6] 150:19–20. They contend that the bad management of Kelley and Prodigious hurt sales in their Centerville and Oxford restaurants and Milledgeville was a bad investment from the beginning that was never profitable and was eventually closed, while Kelley and Prodigious made over $800,000 in management fees between 2009 and 2012. Prodigious Dep. [DE-59-3] 169:7–13; Hill Dep. [DE-59-4] 138:2–13;

9

Butler Dep. [DE-59-5] 35:24–38:19, 42:8–43:12.

## III. STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met its burden, the nonmoving party then must affirmatively demonstrate, with specific evidence, that there exists a genuine issue of material fact requiring trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* at 255 (citation omitted); *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Lovelace v. Sherwin-Williams*

10

*Co.*, 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "a reasonable jury could reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created" and judgment as a matter of law should be denied. *Id.* at 489-90.

Where a non-moving party has been deposed and has submitted affidavit testimony in opposition to summary judgment, the Fourth Circuit has "consistently held that a party cannot create a triable issue in opposition to summary judgment simply by contradicting his deposition testimony with a subsequent affidavit." *Gell v. Town of Aulander*, 252 F.R.D. 297, 301-02 (E.D.N.C. 2008) (quoting *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 438 (4th Cir. 1999)). The court may in fact strike or refuse to consider testimony "where a party by its behavior generates an issue of material fact through the production or manipulation of contradictory sworn testimony." *Id.* at 302 (citing *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)). However, in the absence of a direct conflict between versions of testimony or where the inconsistency is attributable to some other reason than an "objectively discernable attempt to opportunistically create a genuine issue of material fact," the testimony may be considered. *See id.* (attributing the vagueness and minor inconsistencies between sworn testimony from 2002 about events occurring in 1995 and affidavit testimony from 2007 to the passage of time); *see also Rodriguez v. Smithfield Packing Co.*, 545 F. Supp. 2d 508, 514 (D. Md. 2008) (affidavits need not be stricken where there is no direct conflict between versions of testimony).

11

# IV. DISCUSSION

## A.    Breach of Fiduciary Duty Claim

A fiduciary relationship exists where "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *CommScope Credit Union v. Butler & Burke, LLP*, — N.C. —, 790 S.E.2d 657, 660 (2016) (quoting *Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013) (quoting *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001))). A fiduciary relationship can arise as a matter of law by the nature of the parties association, such as attorney and client, trustee and beneficiary, or partners to a partnership. *Id.* (citing *Wachovia Bank & Tr. Co. v. Johnston*, 269 N.C. 701, 711, 153 S.E.2d 449, 457 (1967); *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014)). A limited number of such relationships have been recognized under North Carolina law, and the relationship of financial advisor and client is not among them. *See Dallaire*, 367 N.C. at 367, 760 S.E.2d at 266 (listing categories of fiduciary relationships as a matter of law). Alternatively, a fiduciary relationship can arise in fact because "the existence of a fiduciary relationship 'depends ultimately on the circumstances.'" *CommScope*, 790 S.E.2d at 660 (quoting *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 588, 403 S.E.2d 483, 489 (1991)). "Generally, the existence of a fiduciary duty is a question of fact for the jury." *Trana Discovery, Inc. v. S. Research Inst.*, No. 5:13-CV-848-F, 2014 WL 5460611, at *5 (E.D.N.C. Oct. 27, 2014) (unpublished) (citing *Rhone-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d 540, 546 (M.D.N.C. 1999)). Whether arising by operation of law or in fact, "[a]ll fiduciary relationships are characterized by 'a heightened level of trust and the duty of the fiduciary to act in the best interests of the other party.'" *CommScope*, 790 S.E.2d at 657 (quoting *Dallaire*, 367 N.C.

12

at 367, 760 S.E.2d at 266).

Movants contend that the undisputed facts demonstrate a fiduciary relationship existed between Kelley, a financial advisor, and his clients Hill and Butler. Mem. in Supp. [DE-59] at 19-20. In support, Movants point out that when Butler and Hill met Kelley they were college football players with no financial knowledge or experience; Kelley held himself out as a financial advisor with substantial training and experience; Butler and Hill placed special faith, confidence, and trust in Kelley to oversee their financial affairs; Kelley was involved in every aspect of Butler's and Hill's financial affairs; and Kelley concedes that Butler and Hill trusted him and placed their confidence in him for financial advice. *Id.* (citing Providence Grp. Dep. [DE-59-2] 15:7–11, 25:21–26:1, 140:9–142:18; *Rhodes v. Jones*, 232 N.C. 547, 549, 61 S.E.2d 725, 726-27 (1950); *Lazenby v. Godwin*, 40 N.C. App. 487, 494, 253 S.E.2d 489, 493 (1979)).

Kelley and Prodigious concede that Kelley was a fiduciary in his capacity as a financial advisor but contend that an issue of fact exists as to whether the fiduciary relationship extended to his role assisting Hill and Butler with the Golden Corral franchises. Mem. in Opp'n [DE-69] at 16-17. In support, Kelley and Prodigious assert that Hill and Butler were represented by independent counsel throughout the relationship and Kelley provided different services through Providence Group and Prodigious, which was fully disclosed to Hill and Butler. *Id.*

Kelley testified that Providence Group provided "financial literacy" education and financial planning to its clients, the majority of whom where younger and not familiar with personal finance. Providence Grp. Dep. [DE-59-2] 14:15–15:3. When Kelley began advising Hill and Butler, they were inexperienced in financial matters and trusted Kelley to provide financial advice. *Id.* at 15:7–11, 25:21–26:1. Kelley recognized he had a duty to act in good faith with regards to his

13

client's interests as a financial advisor. *Id.* at 29:19–30:3. And, Kelley concedes his fiduciary obligation to Hill and Butler when acting as their financial advisor. Mem. in Opp'n [DE-69] 16. Thus, there is no question that Kelley owed a fiduciary to Hill and Butler as their financial advisor. *See Kettle v. Leonard*, No. 7:11-CV-189-BR, 2012 WL 4086595, at *11 (E.D.N.C. Sept. 17, 2012) (unpublished) (finding a fiduciary relationship existed between a financial advisor and his client). At issue here is whether that fiduciary relationship extended to the parties' dealings related to Golden Corral.

Kelley testified that he "had two hats," one when working on Providence Group matters as a financial advisor and one when working on Prodigious matters as a business consultant. Providence Grp. Dep. [DE-59-2] 55:14–20. Kelley testified that he viewed his role differently once he began working on the Golden Corral franchises under the Prodigious entity and that everyone understood his change in roles. *Id.* at 127:4–128:5. Kelley could not say with certainty whether he advised Hill and Butler that entering into a business transaction with them might conflict with his role as a financial advisor with a fiduciary duty, but testified that it was "obviously" and "inherently" a new role and "it wasn't that difficult" to discern in what capacity he was acting. *Id.* at 127:4–128:5, 302:8–303:4. In fact, Kelley perceived no conflict between the two. *Id.* at 127:4–128:5. However, Butler and Hill testified that they trusted Kelley when he asked them to sign the service agreements and relied on him to run the Golden Corral business in their best interest because he was their financial advisor. Hill Dep. [DE-59-4] 22:8–26:4, 46:4–47:16, 54:25–56:11, 81:23–82:6, 113:17–114:12; Butler Dep. [DE-59-5] 9:3–13, 13:19–14:3; Butler Dep. [DE-59-5] 18:21–19:16, 24:24–25:17, 149:19–150:2. Hill and Butler believed Kelley was "looking out for [their] interests at all times," Butler Decl. [DE-60] ¶ 9; Hill Decl. [DE-61] ¶ 9, and Kelley has

14

presented no evidence from which a jury could conclude that Kelley made clear to his clients that he was no longer acting in a fiduciary capacity once he began to operate under Prodigious performing work for YBE. In other words, there is no evidence that Kelley "repudiated his fiduciary duties" to Butler and Hill. *RCJJ, LLC v. RCWIL Enters.*, No. 14 CVS 3392, 2016 WL 3850403, at *10 (N.C. Super. June 20, 2016) (unpublished). The North Carolina Business Court recently considered, as an issue of first impression in North Carolina, when as a matter of law a fiduciary is "relieved of his fiduciary duties of care and loyalty by an adversarial negotiation" in the context of the duties owed by a manager or officer to an entity. *Id.* at *8. The court explained that

[C]ases holding that a fiduciary duty can be extinguished in an adversarial setting . . . did not hold that the fiduciary was relieved of his duties merely because the parties had retained attorneys or were negotiating over a separation of interests. Rather, those cases make clear that the facts surrounding the adversarial negotiation must establish that there has been a change in the trusted and confidential nature of the relationship and that the fiduciary has repudiated his fiduciary duties.

*Id.* at *10. Even assuming Hilton and/or Messer represented Hill and Butler in negotiating the agreements between YBE and Prodigious, because Kelley did not clearly repudiate his fiduciary duty he continued to act in a fiduciary capacity to Hill and Butler in his Prodigious role related to Golden Corral. Accordingly, there is no genuine dispute that Kelley owed Hill and Butler a fiduciary duty, and the court turns to the issue of breach.

The North Carolina Supreme Court has recently explained the duty owed by a fiduciary.

If a fiduciary relationship is found to exist, the fiduciary is "held to a standard 'stricter than the morals of the market place' . . . '[n]ot honesty alone, but the punctilio of an honor the most sensitive, is [then] the standard of behavior.'" *Dallaire*, 367 N.C. at 367, 760 S.E.2d at 266 (second alteration in original) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928)). Liability for breach of fiduciary duty "is based on [the taking advantage of] a confidential relationship rather than a specific misrepresentation." *Barger v. McCoy Hillard Parks*, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997) (quoting *Terry v. Terry*, 302

N.C. 77, 85, 273 S.E.2d 674, 678-79 (1981)); *Priddy v. Kernersville Lumber Co.*, 258 N.C. 653, 658, 129 S.E.2d 256, 261 (1963) (stating that liability for breach of fiduciary duty "may exist without any fraudulent intent"). As a result, "[w]here a relation of trust and confidence exists between the parties, there is a duty to disclose all material facts and failure to do so constitutes" a breach of fiduciary duty. *Vail* [*v. Vail*], 233 N.C. [109,] 114, 63 S.E.2d [202,] 206 [(1951)] (internal quotation marks omitted). However, before liability for breach of fiduciary duty can exist, it must be shown that the defendant sought to benefit himself at the expense of the other party. *Barger*, 346 N.C. at 666-67, 488 S.E.2d at 224.

*King v. Bryant*, No. 294PA14, — N.C. —, — S.E.2d —, 2017 WL 382910, at \*8 (2017) (internal footnote omitted). "[F]iduciaries must act in good faith" and "can never paramount their personal interest over the interest of those for whom they have assumed to act." *Miller v. McLean*, 252 N.C. 171, 174, 113 S.E.2d 359, 362 (1960). "Whether a party has acted in good faith is a question of fact for the trier of fact, but the standard by which the party's conduct is to be measured is one of law," and "the circumstances and context in which the party acted must be considered." *Farndale Co., v. Gibellini*, 176 N.C. App. 60, 67-68, 628 S.E.2d 15, 19 (2006) (quoting *Bledsole v. Johnson*, 357 N.C. 133, 138, 579 S.E.2d 379, 382 (2003)).

Movants contend that Kelley breached his fiduciary duty to Hill and Butler by entering into the service agreements through Prodigious with YBE and encouraging his clients to open more restaurants, because the agreements put the interests of Kelley and Prodigious at odds with the interests of Hill, Butler, and YBE. Mem. in Supp. [DE-59] at 21. Movants specifically point to the fact that under the agreements Prodigious (1) was paid on gross revenues, thus, earning money whether the restaurants were profitable or not, and (2) made more money each time a new restaurant was opened regardless of whether opening the restaurant was a sound business decision. *Id.* In support, Movants cite evidence that Prodigious and Kelley profited from the service agreements, while YBE made little profit and reinvested those profits at Kelley's recommendation in

16

Milledgeville, which was a bad investment; suggested Butler and Hill misrepresent their ownership interests in YBE Milledgeville to obtain financing; and, as a result, Prodigious and Kelley profited from the Milledgeville restaurant because it produced gross revenues, while YBE Milledgeville was never profitable for Butler and Hill. *Id.* at 22-23 (citing Providence Grp. Dep. [DE-59-2] 97:10–99:7, 106:20–113:4, 165:24–169:6; Prodigious Dep. [DE-59-3] 208:15–215:6; Hill Dep. [DE-59-4] 138:2–139:11; Butler Dep. [DE-59-5] 24:12–16, 35:22–37:3, 44:14–45:9; Butler Dep. [DE-59-6] 150:15–151:1; YBE Dep. [DE-59-7] 48:1–12).

In response, Kelley and Prodigious contend that Butler first brought the Golden Corral idea to Kelley and that Kelley agreed to assist in the endeavor; Prodigious provided all the services for which it was responsible; Kelley obtained references and referred Hill and Butler to qualified legal counsel, as well as an accountant experienced with Golden Corral, who represented them throughout their relationship with Kelley and Prodigious; Hill and Butler's attorney Messer conducted an in-depth review of the business and found no wrongdoing; and the Centerville and Oxford restaurants were successful and profitable and the lack of success at Milledgeville does not establish wrongdoing by Kelley or Prodigious. Mem. in Opp'n [DE-69] at 14-16; *see also* Providence Grp. Dep. [DE-59-2] 89:8–91:1, 166:5–10; Butler Dep. [DE-59-5] 9:3–13, 51:15–24, 53:17–54:7; Hill Dep. [DE-59-4] 31:6–14, 70:1–72:22; Kelley Aff. [DE-69-1] ¶¶ 11-14. Kelley also testified that he initially recommended Hill and Butler not pursue the Milledgeville opportunity, but later changed his position after the seller proposed a substantially lower price; Hill and Butler understood Milledgeville was a "turn-around" opportunity; and Milledgeville was not profitable due to economic factors beyond the control of Prodigious. Kelley Aff. [DE-69-1] 29-32; Providence Grp. Dep. [DE-59-2] 169:22–171:23, Prodigious Dep. [DE-59-3] 208:15–215:6. Kelley stated that it was initially

17

the bank's recommendation to structure the ownership interests in Milledgeville among the investors so as to qualify for an SBA loan and that it was not Kelley's idea. Providence Grp. Dep. [DE-59-2] 107:5–112:25.

With respect to the management fee Prodigious charged to YBE, Kelley testified that he spoke with Golden Corral corporate about how other franchise groups obtained administrative management services and modeled the fee structure based on what he learned. Prodigious Dep. [DE-59-3] 57:6–58:16. Kelley further explained that 3% of gross revenues was less than the fee others charged for providing similar services and was less than the 4% fee charged by the company that replaced Prodigious. *Id.*; Providence Grp. Dep. [DE-59-2] 167:8–12; Hill Dep. [DE-59-4] 110:10–20; Butler Dep. [DE-59-5] 43:24–44:6; Kelley Aff. [DE-69-1] ¶¶ 16-17. While Movants contend that Prodigious and Kelley provided no evidence to support the claim that 3% of gross revenues was less than other companies charged for similar services, Reply in Supp. [DE-72] at 6, Kelley's deposition testimony regarding the information he obtained from Golden Corral and Butler's deposition testimony that YBE paid a higher fee to the company that replaced Prodigious supports the claim, and Movants have not presented evidence otherwise.

Having considered the evidence of record, including both the evidence specifically cited by the parties, as well as Kelley's affidavit[1] and the complete depositions of Providence Group, Prodigious, Hill, Butler, and YBE, the undersigned concludes that there is a genuine issue of material fact as to whether Kelley breached his fiduciary duty to Hill and Butler. Drawing all justifiable inferences in favor of the non-movant, Movants have failed to demonstrate that "a reasonable jury

---

[1] While Movants criticize Kelley and Prodigious's reliance on Kelley's affidavit, they do not argue that it is a sham affidavit or that it contradicts his previous deposition testimony on behalf of Providence Group or Prodigious. Reply in Supp. [DE-72] at 2. Thus, the court finds no impropriety in considering the Kelley Affidavit. *Gell*, 252 F.R.D. at 302.

18

could reach only one conclusion based on the evidence," *Myrick*, 395 F.3d at 489. The undisputed facts do not demonstrate as a matter of law that Kelley took advantage of his clients' confidence, failed to act in good faith, and sought to benefit himself at the expense of his clients, thus making the determination of breach one for the jury upon consideration of the circumstances and context in which Kelley acted. *See Farndale Co.*, 176 N.C. App. at 67-68, 628 S.E.2d at 19.

The cases relied upon by Movants to support granting summary judgment here are distinguishable. For example, in *Kettle v. Leonard*, the court granted summary judgment to the plaintiffs on claims for fraud, constructive fraud, and unfair and deceptive trade practices where the defendant, the plaintiffs' former financial advisor, committed actual fraud against his clients and took advantage of his position of trust with his clients for his own benefit by misappropriating his clients' funds for his own use. 2012 WL 4086595, at *10-12. There are no allegations in the present case that Kelley committed actual fraud or misappropriated his clients' funds to his personal use. In *Mason v. Coston*, the court upheld a grant of summary judgment on a breach of fiduciary duty claim where the defendant breached her fiduciary duty as attorney-in-fact by "gifting out of the estate" when she transferred a piece of property for no consideration to her family member without the express authority to do so. 179 N.C. App. 863, 635 S.E.2d 536, 2006 WL 2947529, at *2-3 (Oct. 17, 2006) (unpublished). The conduct of Kelley in this case does not rise to the level of the conduct in *Mason*, which violated well-settled law. *Id.* at *2.

To the extent Movants contend that the mere fact of Prodigious's management agreement with YBE, notwithstanding the circumstances, context, and conduct of the parties surrounding the agreement, is a *per se* violation of Kelley's fiduciary duty, Reply in Supp. [DE-72] 3 & 6, Movants have cited no case law on point to support this contention. For example, Movants cite the case of

19

*Vail v. Vail* in support of the proposition that Kelley as a fiduciary "gave up the right to enter arms-length transactions with them." *Id.* at 3. In *Vail*, the defendant, who frequently acted as his mother's agent in handling her rental real estate, had been authorized by her to convey a certain lot to himself, but defendant instead substituted in the deed a lot different from and of greater value than the one his mother intended to convey. 233 N.C. at 114-15, 63 S.E. 2d at 206-07. The lower court dismissed the action to set aside the deed for fraud, but the North Carolina Supreme court reversed, concluding that defendant owed a fiduciary duty to his mother and there was sufficient evidence for the case to be submitted to the jury on the issue of fraud. *Id.* The court did not determine as a matter of law that the transaction was untenable because defendant was a fiduciary, but rather explained that "[w]here a relation of trust and confidence exists between the parties, there is a duty to disclose all material facts, and failure to do so constitutes fraud." *Id.* at 114, 63 S.E.2d at 206.

In sum, there is no genuine dispute that Kelley owed Hill and Butler a fiduciary duty. However, the undisputed facts are not such that the court can determine as a matter of law that Kelley breached the duty owed to his clients. Accordingly, it is recommended that summary judgment on the breach of fiduciary duty claim be denied.

## B. Constructive Fraud Claim

Movants contend they are entitled to summary judgment on their constructive fraud claim essentially for the same reasons stated regarding their breach of fiduciary duty claim. Mem. in Supp. [DE-59] at 27-28. In *King v. Bryant*, the North Carolina Supreme Court recently noted that the "[t]he elements of a claim for breach of fiduciary relationship are the same as those for constructive fraud." 2017 WL 382910, at \*8 n.3. For the reasons stated above with respect to the breach of fiduciary duty claim, there is a genuine issue of material fact as to whether Kelley took advantage

of his position of trust to his own benefit and to the detriment of his clients. Accordingly, it is recommended that summary judgment on the constructive fraud claim be denied.

## C. Breach of Contract Claim

Movants contend that Prodigious cannot recover on its breach of contract claim against YBE because those contracts were a result of Kelley's breach of fiduciary duty and constructive fraud. Mem. in Supp. [DE-59] at 26. Because there is a question of fact as to whether Kelley breached his fiduciary duty or committed constructive fraud, the court cannot find at this time that Prodigious's breach of contract claim is precluded on such grounds. Alternatively, in the reply briefing, Movants assert that Kelley's admission that the service agreements could be shortened by Hill and Butler upon notice to Prodigious entitles Movants to summary judgment on the breach of contract claim, which is based on the termination of those agreements prior to their expiration. Reply in Supp. [DE-72] at 7-8 (citing Kelley Aff. [DE-69-1] ¶ 18). The initial service agreements for Centerville, Oxford, and Milledgeville provide that the term "shall be for a period of Seven (7) years commencing upon execution by both parties. This period may vary according to any changes or modifications requested by the Client . . . ." [DE-1-1] at 10 § 2, 15 § 2, 20 § 2. The 2012 Management Agreement related to those three entities, as well as Valdosta and Tuscaloosa, addresses renewal but contains no such modification term. *Id.* at 28-29 §§ A.1–2, B. It is not clear that Kelley's statement regarding the ability of Hill and Butler to shorten the agreement was an admission that they could unilaterally terminate the contract. Kelley's statement could alternatively be read as an acknowledgment that Hill and Butler could request a modification of the seven-year term, consistent with the initial service agreements. Accordingly, it is recommended that summary judgment on the breach of contract claim be denied.

21

## D.   Unfair and Deceptive Trade Practices Claim

Movants contend that a showing of constructive fraud based on breach of fiduciary duty satisfies the first and third elements of the unfair and deceptive trade practices claim. Mem. in Supp. [DE-59] at 28-29. Because a genuine issue of material fact exists with respect to whether Kelley breached his fiduciary duty to Hill and Butler, this cannot serve as grounds for a finding of liability on the unfair and deceptive trade practices claim at this time. Accordingly, it is recommended that summary judgment on the unfair and deceptive trade practices claim be denied.

## V.  CONCLUSION

Fore the reasons stated herein, it is RECOMMENDED that the motion for summary judgment [DE-58] be DENIED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on the respective parties or, if represented, their counsel. Each party shall have until **March 9, 2017** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.,* 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C. Any response to objections shall be filed within **7 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding**

22

district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins,* 766 F.2d 841, 846-47 (4th Cir. 1985).

SUBMITTED, the **23** day of February 2017.

Robert B. Jones, Jr.
United States Magistrate Judge